**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Lloyd POWELL, Defendant–Appellant.**

**No. 89–5005.**

United States Court of Appeals, Fourth Circuit.

Argued July 14, 1989.

Decided Sept. 22, 1989.

Rehearing and Rehearing In Banc Denied Oct. 25, 1989.

Joseph John McCarthy (Dawkins, Hanagan, McCarthy & Sengel, P.C., Alexandria, Va., on brief), for defendant-appellant.

Michael Smythers (Henry E. Hudson, U.S. Atty., Alexandria, Va., Rebecca Kettelle Pyne, Sp. Asst. U.S. Atty., Washington, D.C., on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, and PHILLIPS and WILKINSON, Circuit Judges.

ERVIN, Chief Judge:

Lloyd Powell appeals his conviction for possession with the intent to distribute more than fifty grams of crack cocaine, and the enhanced sentence imposed on him pursuant to the applicable statutory provisions. He alleges that the government lacked probable cause to arrest him, and that the prosecution acted in bad faith in failing to provide him with *Brady* material. Powell also claims that the government failed to prove beyond a reasonable doubt the amount of cocaine he possessed, and that the district court therefore improperly enhanced his sentence. Finding that law enforcement officials had probable cause to arrest Powell, and that the government's *Brady* violation constituted harmless error, we affirm the conviction. We also affirm the enhanced sentence, on the grounds that the government only had to prove the amount of cocaine in Powell's possession by, at most, a preponderance of the evidence.

## I.

### Factual Background

Powell was charged with one count of possession with the intent to distribute 50 grams or more of crack cocaine, in violation of 21 U.S.C. § 841, and one count of travel in interstate commerce in aid of racketeering, in violation of 18 U.S.C. § 1952. The count charging the Travel Act violation was later dismissed by the government. He was convicted following a bench trial, and was sentenced to 120 months imprisonment, with five years supervised release.

The evidence at trial established that on August 25, 1988 Drug Enforcement Administration ("DEA") Agent William Callahan and Loudoun County Sheriff's Officer Peter Becerra observed appellant as he arrived at Washington National Airport on a flight from New York's LaGuardia Airport. The agents felt that Powell met the profile of a drug courier because (1) he was coming from a source city; (2) he flew in on the LaGuardia shuttle, which is commonly used by crack or cocaine couriers; (3) he walked in an awkward, bowlegged fashion, typical of one carrying concealed illicit drugs; (4) he exhibited a large bulge, about the size of a softball, in his front pocket; and (5) he continually looked around and to his rear. According to Agent Callahan, he had made 35–40 previous arrests of drug couriers, and about ⅓ of these couriers had exhibited bulges in their pockets similar to Powell's. Becerra testified that he had made approximately 20 arrests of drug couriers, and in 75% of those cases the suspects had carried the controlled substance in their pockets.

After identifying Powell as a possible drug courier the agents approached him, identified themselves, and asked if he would speak with them. Powell agreed, and in response to questioning stated that he had left his ticket on the plane, that he had just come from New York, and produced a New York driver's license. Powell consented to a search of his bag, but the search revealed nothing incriminating.

When asked about the bulge in his pocket, Powell replied that it was tissue, but he declined to show it to the agents. Powell also refused to consent to a pat down search of his person, but he agreed to accompany the agents to the airport police station so that a trained dog could conduct a "sniff search" for narcotics.

As they walked towards the police station Agent Callahan again asked Powell about the bulge in his pocket. At this point Powell made a U-turn and began heading for the exit. Callahan followed him, and again asked about the contents of his pocket. Powell responded, "[y]ou know what it is. It's bad." Powell then stated he had to go to the bathroom. At this time an unidentified individual, later determined to be an off duty D.C. Corrections officer, approached the agents and began to question them concerning their treatment of

Powell. Powell fled towards the exit, and Becerra and Callahan pursued him. When they caught Powell, the agents placed him under arrest and conducted a search of his person. That search revealed six packets containing 540 vials of crack cocaine.

At trial Veldoster Ingram, a DEA chemist, testified that in his opinion the 540 vials contained 66 grams of 100% pure cocaine base. Ingram based his conclusion upon his analysis of 24 of the 540 vials. Ingram chose to test 24 of the vials because that number approximately represented the square root of 540. The 24 samples included 4 vials taken from each of the six separate packets Powell was carrying.

## II.

### Probable Cause to Arrest

■ The district court's finding that the law enforcement agents had probable cause to arrest Powell is supported by Fourth Circuit precedent. In *U.S. v. Aguiar*, 825 F.2d 39 (4th Cir.1987), SBI agents received a tip from two "concerned citizens" that two men on board a Piedmont flight from Miami to Charlotte were using cocaine. While questioning the men in an airport bar, the agents noticed Aguiar had a large bulge on his left ankle, and that his one-way plane ticket, which had been issued under an assumed name, had been purchased with cash and had no luggage claim checks attached. Based on this information, the SBI agents arrested Aguiar, conducted a search, and discovered that the bulge on his ankle was a package containing cocaine. On appeal this court sustained Aguiar's conviction, and found that the "policeman's observance of the bulge at the ankle ... in combination with the drug courier profile characteristics exhibited by Aguiar ... constitute[d] probable cause for arrest. Out of the policeman's experience, he recognized that the bulge was probably caused by a packet of illicit drugs ... What the policeman knew and observed therefore was far more than the fact that Aguiar met the generalized drug courier profile characteristics." 825 F.2d at 41.

In *U.S. v. Haye*, 825 F.2d 32 (4th Cir. 1987) DEA agents at Washington National Airport attempted to question two individuals, Haye and Reid, who met the drug courier profile. When the plain clothesmen identified themselves as law enforcement officials, Haye and Reid immediately fled, each going in a different direction. Upon apprehending Haye, the officer asked if the "stuff" was in the suspect's bag. Haye responded affirmatively and the agent arrested him and searched the bag. A second DEA agent caught Reid and noticed a bulge "about the size of a baseball below Reid's belt." 825 F.2d at 34. The agent squeezed the bulge, concluded it was narcotics and placed Reid under arrest.

In sustaining the convictions this court first found that the drug courier profile characteristics of the men, in conjunction with their flight, "furnished reasonable suspicion for a brief, involuntary, investigative stop." The court went on to hold that following their apprehension by police officers, probable cause existed to arrest the men, stating:

Haye was arrested only after he admitted that he had cocaine in his bag. His admission was quite sufficient to provide probable cause for his arrest and the subsequent search of his bag.

Reid was not arrested until after the agent had observed the large bulge in his trousers beneath his belt. With the background of all that [the agent] had observed, including Reid's attempt to escape, the incriminating bulge in Reid's trousers ... furnished probable cause for his arrest. When there are other indications of drug courier activity, the presence of such a suspicious bulge can provide a trained drug enforcement officer with probable cause to believe that the bulge is a package containing narcotics.

*Id.* at 35. (citations omitted).

Under both *Haye* and *Aguiar*, the existence of the drug courier characteristics, in conjunction with Powell's statement to the agents that the contents of his pocket "were bad" and his attempted flight, pro-

vided the agents with probable cause to arrest Powell.

### III.

#### Brady Material

■ Becerra obtained the license plate number of the car driven by the "intermeddler" in order to determine whether charges of obstruction should be brought against him, or whether he was also a narcotics trafficker. When a motor vehicle search revealed that the individual was a D.C. corrections officer, Becerra decided that he was a "good faith" intermeddler, and elected not to pursue the issue.

Prior to trial Powell requested from the government the name of this individual, as he wanted to investigate the possibility of calling him as a defense witness. The government, however, was unable to supply Powell with the officer's identity. Powell then moved for dismissal of the indictment, claiming that the government's failure in this regard denied him due process of the law, because the identity of the witness constituted exculpatory *Brady* material. The district court denied the motion, finding that "there is wholly insufficient evidence to establish that this information under *Brady* or *Aguiar* would be material" to Powell's defense.

We begin our *Brady* review by noting the complete lack of evidence that the prosecutor[1] made any significant attempt, much less the good faith attempt he was obligated to make, to supply Powell with the requested information. The government was not faced with a situation where the "lost witness" might have been anyone in the Metropolitan D.C. area. The witness was, in fact, a known employee of the D.C. Corrections Department. Given this fact, we believe that the government most likely could have, through the exercise of due diligence "rediscovered" the intermeddler's identity. This could have been accomplished by having Becerra review a list of D.C. Corrections Officers, or by sending a memo to all of those individuals. The government made no efforts such as these.

The government, however, is saved from the consequences of its own misconduct by the Supreme Court's decision in *United States v. Valenzuela–Bernal*, 458 U.S. 858, 873, 102 S.Ct. 3440, 3449–3450, 73 L.Ed.2d 1193 (1981). There the Court held that *Brady* requires the prosecution to furnish only material evidence, and that the defendant bears the burden of showing how the lost evidence would have been both material and favorable to his defense.

Powell alleges that the evidence of this witness was material, because it could have helped to prove that "seizure occurred well before the trial court found probable cause for [his] arrest existed." The record reveals, however, that there was ample evidence before the trial court concerning whether a seizure occurred and if so, when. This testimony came from both the arresting officers and Powell himself. Powell's testimony concerning the conduct of the *agents* during that time did not substantially conflict with that of Becerra and Callahan, and Powell confirmed that up until the time of his arrest, the agents neither touched him nor made any attempt to restrain him physically. The only discrepancies between the two versions arose with respect to Powell's conduct. Powell stated that he neither looked around after deplaning nor told the agents that the contents of his pocket were "bad."

Powell failed to explain how the testimony of the intermeddler could possibly have differed from either his own testimony or that of the DEA agents, and therefore how it would have established that the agents' conduct constituted a seizure of Powell's person. For that reason we find that the government's failure to produce the requested information was harmless error.

### IV.

#### Evidentiary Standard for Proving the Quantity of the Drug

■ Because Powell was convicted of possessing more than 50 grams of crack,

---

1. We note that the prosecutor at this trial was not the attorney who argued the case for the government before this panel.

the trial court was able to enhance his sentence pursuant to the provisions found in 21 U.S.C. § 841(b)(1)(A).[2] Powell claims that the government failed to prove beyond a reasonable doubt that he in fact possessed more than 50 grams of the drug, because it tested only 24 of the 540 vials seized from him.

We find, however, that because the quantity of the drug went to the question of Powell's sentence, rather than his guilt, the government only had to prove that quantity by a preponderance of the evidence. *See McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). In *McMillan,* the Supreme Court upheld a provision of Pennsylvania's Mandatory Minimum Sentencing Act, which provided that anyone convicted of certain enumerated felonies was subject to a mandatory minimum sentence of five years' imprisonment if the sentencing judge found, by a preponderance of the evidence, that the person "visibly possessed a firearm" during the commission of the offense. The Court rejected the petitioner's argument that possession of a firearm constituted a substantial element of the offense, and therefore had to be proved beyond a reasonable doubt. Rather, because the possession was a sentencing factor to be considered by the sentencing court, the Court held that proof of the "visible possession" by a preponderance of the evidence met the constitutional requirement of due process. In reaching this conclusion the Court stated:

> Petitioner did not and could not claim that a sentencing court may never rely on a particular fact in passing sentence without finding that fact by "clear and convincing evidence." Sentencing courts have traditionally heard evidence and found facts without any prescribed burden of proof at all.

Like the question of firearm possession at issue in *McMillan,* the quantity of drugs possessed by Powell was a statutory sentencing factor rather than a substantive element of the offense. The government, therefore, was obligated to prove that amount by, at most, a preponderance of the evidence. See *United States v. Jenkins,* 866 F.2d 331, 334 (10th Cir.1989) (To obtain an enhanced sentence under § 841(b)(1)(A) the government is not required "to independently prove the essential quantities [of the narcotic] beyond a reasonable doubt."). For that reason we hold that the trial court could properly find that Powell possessed at least 50 grams of crack based on the expert testimony of Ingram concerning his testing of 24 random vials.

For the reasons set forth above both the conviction and the sentence of Powell are hereby

AFFIRMED.

---

**2.** 21 U.S.C. § 841(b)(1)(A) provides, in relevant part, that

> anyone convicted of possession with intent to distribute 50 grams or more of cocaine or its derivative shall be sentenced to no less than ten years imprisonment and a supervised release term of at least five years.