**UNITED STATES of America,
Appellant,**

v.

**Marcus HOOPER, Appellee.**

**No. 1168, Docket 90–1584.**

United States Court of Appeals,
Second Circuit.

Argued April 17, 1991.
Decided June 5, 1991.

Thomas S. Duszkiewicz, Asst. U.S. Atty., W.D.N.Y., Buffalo, N.Y. (Dennis C. Vacco, U.S. Atty., on the brief) for appellant U.S.

Mark J. Mahoney, Buffalo, N.Y. (Bermingham, Cook & Mahoney, Buffalo, N.Y., on the brief) for appellee Marcus Hooper.

Before TIMBERS, MESKILL and PRATT, Circuit Judges.

TIMBERS, Circuit Judge:

The United States appeals from an order entered September 19, 1990, in the Western District of New York, Richard J. Arcara, *District Judge*, granting the motion of appellee Marcus Hooper to suppress physical evidence seized from a suitcase.

On September 20, 1989, Marcus Hooper was named in a two count indictment. Count one charged him with possession of cocaine with intent to distribute it in violation of 21 U.S.C. § 841(a)(1) (1988). Count two charged him with carrying a firearm in connection with a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) (1988). The physical evidence supporting those charges was seized after an encounter between Hooper and members of a Drug Enforcement Administration (DEA) task force at the Greater Buffalo International Airport (the airport). After briefly questioning Hooper, the agents seized a suitcase that he was carrying pending application for a search warrant. Immediately thereafter the agents conducted an investigation that lasted less than 30 minutes. A search warrant was obtained approximately 23 hours after the seizure. A search of the suitcase revealed 281 grams of cocaine and an Uzi Mini Carbine with a 30 round magazine.

The district court granted Hooper's motion to suppress the physical evidence seized from the suitcase. The court held

that the extended seizure of the suitcase violated Hooper's fourth amendment rights.

On appeal, the government contends that the district court erred since the initial seizure of the suitcase was supported by reasonable suspicion and, shortly thereafter, the agents developed probable cause to seize the suitcase pending application for a search warrant.

For the reasons that follow, we reverse the judgment of the district court and remand for proceedings consistent with this opinion.

## I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

Police Officer Thomas Gerace of the Niagara Frontier Transportation Authority (NFTA) and United States Border Patrol Agent Daniel Allman (collectively "the agents") are assigned to a DEA task force that enforces immigration, drug, and currency laws at the airport and at other Buffalo transportation centers. As part of their training, members of the task force are familiarized with certain characteristics that constitute a profile of persons that may be engaged in illicit narcotics activity. Their duties at the airport include scrutinizing passengers as they deplane to determine whether any fit this profile. On May 15, 1989, Gerace and Allman were on duty in plain clothes at the airport. Gerace was working a 3 p.m. to 11 p.m. shift that day.

At approximately 4:25 p.m., Gerace and Allman were watching passengers deplane from United Airlines' flight 948, which originated in Oakland, California, and terminated in Buffalo, making one stop in Chicago. The agents were interested in that flight since it originated in a "source city", i.e., a city from which narcotics are transported to Buffalo. Hooper was one of the last passengers to leave the plane. He was not carrying any luggage and appeared to be travelling alone. Gerace thought that Hooper looked familiar, but could not place his face.

As Hooper walked through a corridor that led to the concourse area, the agents observed him looking from side to side. He entered a glass enclosed video game room, but did not play any video games. Instead, he kept his eyes on the concourse area. Hooper stayed in the game room for approximately two minutes. Gerace and Allman decided that Hooper merited further attention.

When Hooper left the game room, he proceeded across the concourse area in the direction of the down escalator. Just prior to getting on the escalator, Hooper veered to his left and stopped at a bank of public telephones, where he stayed for approximately one minute. Hooper appeared to retrieve change from the telephone, indicating that he did not successfully complete a call. Hooper then proceeded to the down escalator.

Gerace and Allman followed Hooper down to the lower level of the airport. They located Hooper at the United baggage claim area. He retrieved a green hard shell bag that was wrapped in airline tape and headed for the exit. Before Hooper reached the exit, Gerace and Allman approached him. Gerace identified himself as a DEA agent, displayed his identification, and asked Hooper if they could speak with him. Hooper agreed to speak with the agents. He indicated his assent by saying either "yes" or "okay." At Gerace's suggestion, they moved to a less congested area so that they would not disrupt the pedestrian traffic exiting and entering the airport.

Gerace asked Hooper where he was coming from and requested that he produce his airline ticket. Hooper produced a one way ticket that had been paid for in cash that morning in Oakland. The ticket cost over $500 and was in the name of Kenny Fields. Hooper stated that his name was Kenny Fields and the name "Fields" appeared on the identification tag on the suitcase. When Gerace asked Hooper for identification, he stated that he was not carrying any identification. Allman asked Hooper for his place of residence and for his date

of birth. Hooper responded that he lived in Buffalo. He began to stutter when trying to recall his birth date. Hooper, who was 19 at the time, initially told Allman that he was born in 1930 or 1931, but then produced a birth date that seemed to correspond to his appearance—of 19, rather than 58 or 59.

At this point, Gerace told Hooper that the agents were concerned with narcotics coming through the airport and asked Hooper if he could look in his suitcase. Hooper responded that he did not have a key. Gerace asked Hooper if he owned the bag. Hooper stated that he did not own the bag, but that some of his possessions were in it. In response to Allman's question as to whether he had come from California, Hooper stated that he had come from Chicago. When shown his ticket, which was purchased that morning in Oakland, he stated that he came from California.

Gerace asked Hooper if he was carrying any contraband. Hooper responded that he was not. Gerace questioned Hooper about the key to the suitcase. Hooper stated that "his people" had put "stuff" in the suitcase and that he did not have the key. Gerace asked Hooper who "his people" were. Hooper asked Gerace if he had to divulge that information and Gerace told him that he did not. Gerace questioned Hooper as to the whereabouts of the key. Hooper stated that one key was in Chicago and one key was in Buffalo. Hooper refused Gerace's request to run the suitcase through a magnetometer. He appeared nervous at the suggestion. At that point approximately five minutes had transpired from the time the agents initially approached Hooper.

Gerace thereupon informed Hooper that he intended to seize the suitcase and to attempt to obtain a search warrant. Gerace told Hooper that he could obtain a receipt if he accompanied the agents to the DEA office. Hooper picked up the suitcase and accompanied the agents to the DEA office, which was located in the airport. When they arrived at the office, Hooper provided the agents with an address where he was staying and a telephone number

that they could call to verify his identity. The address he gave was 11 Southampton Street in Buffalo. The agents provided Hooper with a receipt that contained the phone number and address of the DEA office. The agents told Hooper that he was free to leave and that they would contact him or he could contact them concerning the return of the suitcase. Hooper left the office without the suitcase and headed for a taxi stand.

After Hooper's departure, Allman called the telephone number that Hooper had provided. The person who answered the phone could not identify Kenny Fields. Allman traced the address to which the telephone number was listed through a directory. He determined that the telephone number was registered to an address at 12 Ruhland Street. Next, Allman attempted to ascertain where Hooper had been dropped off when he left the airport. Allman learned that Hooper had not gone directly to the address that he had provided to the agents.

Gerace called the Buffalo Police Narcotics Unit and spoke to Detective Darnell Parker. Gerace described Hooper's physical appearance to Parker and informed Parker of the address Hooper had provided and the address to which the phone number he had provided was listed. Parker told Gerace that a person fitting Hooper's description was the subject of a recent Buffalo Police Information Bulletin (the bulletin). In addition, Parker told Gerace that the addresses were the subject of an ongoing investigation involving a group of individuals transporting narcotics and weapons from California. Moreover, the addresses also were consistent with information that was contained in the bulletin.

Accordingly, Gerace and Allman obtained a copy of the bulletin at the NFTA office, which was located next to the DEA office in the airport. Both agents had seen the bulletin previously. The bulletin contained mug shots of four men. The agents recognized one of the men, Marcus Hooper, as the man who had identified himself to them as Kenny Fields in the airport. The bulletin revealed Hooper's prior arrest with two

other individuals for possession of an automatic weapon, his association with other individuals involved with weapons and narcotics, and warned officers to approach Hooper with extreme caution. It also listed Hooper's address as 11 Southampton Street. Moreover, the address of one of the individuals arrested with Hooper, Antonio Littlefield, was listed as 12 Ruhland Street. The bulletin also revealed that the individuals had used phony identification and aliases in the past.

At approximately 5 p.m., after examining the bulletin, Gerace called the United States Attorney's Office to begin the process of obtaining a search warrant. He was told that it would be easier to obtain a search warrant the following morning. Accordingly, Gerace locked the suitcase in the DEA office overnight.

The following day, Gerace prepared an affidavit. A search warrant was obtained at 3:44 p.m. on May 16, 1989, more than 23 hours after the initial seizure of the suitcase. The warrant authorized the agents to search the suitcase for weapons, narcotics or money. The search was conducted at approximately 4:30 p.m. It yielded 281 grams of cocaine and an Uzi Mini Carbine with a 30 round magazine.

On May 17, 1989, an arrest warrant was issued for Hooper. He was not arrested on that warrant until September 14, 1989, following his arrest on unrelated state charges. Hooper was charged with one count of possession of cocaine with intent to distribute it, and one count of possession of a firearm in connection with a drug trafficking offense. Hooper moved to suppress the physical evidence gathered from the suitcase, contending that it was obtained in violation of his fourth amendment rights. On September 19, 1990, after holding a hearing at which Gerace and Allman testified, the district court granted Hooper's motion. The court held that the seizure of the bag for more than 23 hours violated Hooper's fourth amendment rights.

This appeal followed.

## II.

We review the district court's factual findings under a clearly erroneous standard. *United States v. Uribe–Velasco*, No. 90–1333, slip op. at 3707, 3713–14 (2 Cir. April 18, 1991); *United States v. Montilla*, 928 F.2d 583, 588 (2 Cir.1991); *United States v. Jefferson*, 925 F.2d 1242, 1248 (10 Cir.1991); *United States v. Johnson*, 903 F.2d 1219, 1221 (9 Cir.), *cert. denied*, 111 S.Ct. 520 (1990). The district court's determination as to whether those facts establish a fourth amendment violation is subject to *de novo* review. *Uribe–Velasco, supra,* slip op. at 3714; *Montilla, supra,* 928 F.2d at 588; *Jefferson, supra,* 925 F.2d at 1248–49; *Johnson, supra,* 903 F.2d at 1221.

## III.

■ We turn first to the encounter between the agents and Hooper. Hooper contends, as alternative grounds for affirming the district court opinion, that the agents' conduct in approaching him and asking him questions amounted to a seizure of his person absent any level of objective justification. Under Hooper's analysis, the subsequent search yielded fruit of this illegal seizure. We agree with the district court's conclusion that this encounter did not implicate the fourth amendment.

■ The district court found that Hooper consented to his encounter with Gerace and Allman. Hooper contends that an individual cannot consent to be stopped by law enforcement officers. He reasons that any consent must be invalid since it inevitably must be given after the individual has come into contact with law enforcement officers and the fourth amendment has already been implicated. The fallacy in Hooper's contention lies in the fact that a "seizure" for the purposes of the fourth amendment is not defined by whether an individual has halted his forward progress in response to police conduct, but rather is defined by the coercive nature of the police conduct. *E.g., Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) ("[t]he test [for determining whether a seizure has occurred] ... is designed to

assess the coercive effect of police conduct"). Thus, Hooper did not consent to a seizure; rather, there was no seizure since Hooper consented to the encounter with the agents.

■ There are three types of encounters that may occur between law enforcement officers and individuals. *United States v. Bradley,* 923 F.2d 362, 364 (5 Cir.1991); *United States v. Johnson,* 910 F.2d 1506, 1508 (7 Cir.1990), *cert. denied,* 111 S.Ct. 764 (1991); *United States v. Flowers,* 909 F.2d 145, 147 (6 Cir.1990) (per curiam). The first type occurs when an individual agrees to speak to a law enforcement officer absent any duress or coercion. *Bradley, supra,* 923 F.2d at 364; *Johnson, supra,* 910 F.2d at 1508; *Flowers, supra,* 909 F.2d at 147. The second involves a limited detention of the individual based on a reasonable suspicion that criminal activity is underway. *Bradley, supra,* 923 F.2d at 364; *Johnson, supra,* 910 F.2d at 1508; *Flowers, supra,* 909 F.2d at 147. The third involves an arrest based on probable cause that a crime has been committed. *Bradley, supra,* 923 F.2d at 364; *Johnson, supra,* 910 F.2d at 1508; *Flowers, supra,* 909 F.2d at 147. The first type of encounter does not implicate the fourth amendment, while the latter two are "seizures" within the meaning of the fourth amendment. *Bradley, supra,* 923 F.2d at 364; *Johnson, supra,* 910 F.2d at 1508; *Flowers, supra,* 909 F.2d at 147.

It is well settled that "[t]he Fourth Amendment does not proscribe all contact between the police and citizens, but is designed 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" *INS v. Delgado,* 466 U.S. 210, 215 (1984) (citation omitted); *see also United States v. Mendenhall,* 446 U.S. 544, 553–54 . (1980) (opinion of Stewart, J.) (same); *Terry v. Ohio,* 392 U.S. 1, 19 n. 16 (1968) ("[o]bviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons"); *United States v. Lee,* 916 F.2d 814, 819 (2 Cir.1990) ("[n]ot every encounter between a police officer and an individual is a seizure impli-cating the fourth amendment's protections"). The parameters of the doctrine permitting consensual encounters between law enforcement officers and individuals were set forth in *Florida v. Royer,* 460 U.S. 491 (1983):

> "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. *See Dunaway v. New York,* [442 U.S. 200, 210 n. 12 (1979)]; *Terry v. Ohio,* 392 U.S., at 31, 32–33 (Harlan, J., concurring); *id.,* at 34 (WHITE, J., concurring). Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. *United States v. Mendenhall,* 446 U.S. 544, 555 (1980) (opinion of Stewart, J.). The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. *Terry v. Ohio,* 392 U.S., at 32–33 (Harlan, J., concurring); *id.,* at 34 (WHITE, J., concurring). He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. *United States v. Mendenhall, supra,* at 556 (opinion of Stewart, J.). If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed."

*Id.* at 497–98 (plurality opinion).

In short, "[p]olice officers enjoy 'the liberty (... possessed by every citizen) to address questions to other persons.'" *Mendenhall, supra,* 446 U.S. at 553 (opinion of Stewart, J.) (quoting *Terry, supra,* 392 U.S. at 32 (Harlan, J., concurring)); *see also Terry, supra,* 392 U.S. at 34 (White, J., concurring) ("[t]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on

the streets"); *People v. De Bour*, 40 N.Y.2d 210, 219 (1976) ("the practical necessities of law enforcement and the obvious fact that any person in our society may approach any other person and attempt to strike up a conversation, make it clear that the police have the authority to approach civilians"). The fact that an individual is more likely to respond to a law enforcement officer than to another individual "hardly eliminates the consensual nature of the response." *Delgado, supra*, 466 U.S. at 216. It follows from this analysis that, if Hooper was not seized within the meaning of the fourth amendment, his encounter with the agents did not implicate the fourth amendment.

■ A seizure within the meaning of the fourth amendment occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen...." *Terry, supra*, 392 U.S. at 19 n. 16. The test for determining whether an individual has been restrained by coercive police conduct was set forth first in Justice Stewart's opinion in *United States v. Mendenhall*, 446 U.S. 544, 554 (1980):

> "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

That test was adopted by the Court in subsequent cases. *Chesternut, supra*, 486 U.S. at 573; *Delgado, supra*, 466 U.S. at 215; *Royer, supra*, 460 U.S. at 502; *see also California v. Hodari D.*, 59 U.S.L.W. 4335, 4337 (U.S. April 23, 1991) (*Mendenhall* test "states a *necessary*, but not a *sufficient* condition for seizure" (emphasis in original)). This objective test allows law enforcement officers to predict the ramifications of their conduct and ensures a uniform application of fourth amendment protection to similarly situated individuals. *Chesternut, supra*, 486 U.S. at 574. It calls for a contextual approach that takes into account the particular facts of each case to meet varying circumstances. *Chesternut, supra*, 486 U.S. at 572–73.

The subjective intentions of the police officers during an encounter are relevant only to the extent that they are conveyed to the individual approached. *Id.* at 575 n. 7; *Mendenhall, supra*, 446 U.S. at 554 n. 6 (opinion of Stewart, J.).

We previously have identified factors that might be relevant to a determination of whether a seizure implicating the fourth amendment has occurred. These factors include:

> "the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room."

*Lee, supra*, 916 F.2d at 819; *see also Mendenhall, supra*, 446 U.S. at 554 (opinion of Stewart, J.); *Montilla, supra*, 928 F.2d at 588; *United States v. Barrios–Moriera*, 872 F.2d 12, 15 (2 Cir.), *cert. denied*, 110 S.Ct. 364 (1989).

Applying these factors, we recently have held that encounters between individuals and law enforcement officers, similar to the one involved in the instant case, do not constitute seizures within the meaning of the fourth amendment. In *Lee, supra*, 916 F.2d at 819, we considered a case in which two officers approached an individual as he was leaving the Buffalo airport. After the officers identified themselves, the individual agreed to talk with the officers and agreed to move out of the way of pedestrian traffic. The officers asked the individual for identification and for his plane ticket, and posed several questions to him about his travels. In response to a question, the officers informed the individual that they suspected he was carrying contraband. *Id.* at 816–17. We held that this was not the sort of coercive police conduct that amounted to a seizure under the fourth amendment.

Similarly, in *United States v. Montilla*, 928 F.2d 583 (2 Cir.1991), we considered an encounter between individuals and law en-

forcement officers at the Buffalo bus terminal. In that case, two officers approached two individuals as they were about to leave the bus terminal. The officers identified themselves and asked if they could speak with the individuals. The individuals agreed to speak with the officers. The officers asked the individuals for identification and posed questions about their journey. *Id.* at 585. We held that those facts, if taken as true, did not amount to a seizure under the fourth amendment. *Id.* at 589–90.

The facts in the instant case also lead to the conclusion that "the encounter possessed none of the indicia of force or authority that typically earmarks a Fourth Amendment seizure...." *Barrios–Moriera, supra,* 872 F.2d at 15. The agents did not use or threaten to use physical force to restrain Hooper. He voluntarily agreed to speak with the agents. The agents did not display their weapons and were courteous throughout the encounter. The fact that the agents did not inform Hooper at the outset that he was free to leave did not convert the encounter into a seizure. *Delgado, supra,* 466 U.S. at 215; *Montilla, supra,* 928 F.2d at 589. Moreover, when Hooper inquired as to whether he had to answer a question, the agents informed him that he did not and they honored his ensuing silence on that issue. Similarly, the agents did not apply any pressure when Hooper refused their request to run the suitcase through a magnetometer. While this refusal itself could not provide a legal basis for an enhancement of the agents' suspicions, it necessarily contributed to the agents' delay in ending their encounter with Hooper. The resultant delay, however, should not inure to Hooper's benefit and transform a police-citizen encounter into a seizure under the fourth amendment. Nor did the fact that the agents asked Hooper if he was carrying contraband require a finding that the encounter had been converted into a seizure. *E.g., Lee, supra,* 916 F.2d at 819. Other courts confronting similar factual scenarios have held that law enforcement officers do not seize an individual merely by approaching him in an airport and posing questions to him. *E.g.,*

*Bradley, supra,* 923 F.2d at 364–65 (two officers approached individual, identified themselves, and questioned individual after receiving consent to speak with individual); *United States v. Cooke,* 915 F.2d 250, 251–52 (6 Cir.1990) (same); *United States v. Sterling,* 909 F.2d 1078, 1082 (7 Cir.1990) (same); *Johnson, supra,* 903 F.2d at 1221 (same); *United States v. Gordon,* 895 F.2d 932, 937–38 (4 Cir.) (same), *cert. denied,* 111 S.Ct. 131 (1990); *United States v. Hernandez,* 854 F.2d 295, 297 (8 Cir.1988) (same).

Since a reasonable person would have felt free to leave, the agents were not required to justify their approach to Hooper by demonstrating any level of suspicion that criminal activity was underway. The fact that such encounters may "expose significant numbers of law-abiding passengers to random questioning by the police" does not convert the encounter into an unconstitutional seizure as long as the individual is not compelled to participate by coercive police conduct. *United States v. Lewis,* 921 F.2d 1294, 1300 (D.C.Cir.1990).

We hold that the agents did not seize Hooper within the meaning of the fourth amendment when they initially approached him since a reasonable person would have felt free to leave. Accordingly, the agents' initial approach to Hooper did not implicate the fourth amendment and the agents were not required to justify that conduct based on any level of suspicion that Hooper was engaged in criminal activity.

## IV.

This brings us to the seizure of the suitcase. The government contends that the initial seizure of the suitcase and the investigation that followed were justified based on reasonable suspicion that the suitcase contained contraband. The government further contends that, since the agents developed probable cause soon thereafter, the continued seizure of the suitcase pending application for a search warrant was justified. We agree.

In *Terry v. Ohio, supra,* 392 U.S. at 20, the Supreme Court held that the need of

law enforcement officers to respond to "on-the-spot observations" justified a limited seizure of an individual and subsequent search for weapons based on facts that did not constitute probable cause. In so holding, the Court "establish[ed] that in appropriate circumstances the Fourth Amendment allows a properly limited 'search' or 'seizure' on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime." *United States v. Brignoni–Ponce*, 422 U.S. 873, 881 (1975). Seizures based on this doctrine are not governed by the fourth amendment's warrant requirement, but rather, "rest[ ] on a balancing of the competing interests to determine the reasonableness of the type of seizure involved within the meaning of 'the Fourth Amendment's general proscription against unreasonable searches and seizures.'" *United States v. Place*, 462 U.S. 696, 703 (1983) (citation omitted).

In *Place, supra*, 462 U.S. at 702, the Court, applying this balancing test, held that personal luggage could be seized for a brief period upon reasonable suspicion that it contained narcotics "for the purpose of pursuing a limited course of investigation, short of opening the luggage, that would quickly confirm or dispel the authorities' suspicion." Since a seizure of an individual's luggage "intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary," the Court applied the same standards to determine the reasonableness of a limited seizure of an individual's luggage as it set forth in *Terry* to determine the reasonableness of an investigative detention of an individual. *Id.* at 708–09. That inquiry involves a two step determination: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry, supra*, 392 U.S. at 20.

### (A)

■ We consider first whether the agents' conduct was justified at its inception. The government concedes that, at the point of the initial seizure of the suitcase, the agents were not aware of facts that gave them probable cause to believe that it contained contraband. The government contends, however, that the initial seizure was justified by the agents' reasonable suspicion that the suitcase contained contraband. We agree.

It is clear that the agents seized the suitcase within the meaning of the fourth amendment when they informed Hooper that they intended to hold the suitcase for the purpose of obtaining a search warrant. *Place, supra*, 462 U.S. at 707. Accordingly, the government must demonstrate that, at the point of the seizure, the agents had at least a reasonable suspicion based on specific and articulable facts that the suitcase contained contraband.

■ To justify a *Terry* type detention, a law enforcement officer must have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'...." *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *see also Terry, supra*, 392 U.S. at 21, 30. The term "reasonable suspicion" is not capable of a precise definition. It is clear, however, that "an 'inchoate and unparticularized suspicion or hunch'" on the part of a law enforcement officer will not suffice to establish reasonable suspicion. *Sokolow, supra*, 490 U.S. at 7 (citation omitted). Rather, the officer must provide "specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry, supra*, 392 U.S. at 27. In making this determination, we consider the totality of the circumstances. *Sokolow, supra*, 490 U.S. at 8. Acts that considered in isolation are consistent with innocent travel, nevertheless, when considered together, may establish cause for further investigation. *Id.* at 9–10.

■ We turn now to the facts known to the agents at the time they seized the suitcase. The agents knew that Hooper was one of the last passengers to deplane from a flight arriving from a "source city", that after deplaning he continually looked about the concourse, that he had paid for

his one way ticket in cash that morning, and that he was unable to produce any identification. Those factors are consistent with the drug courier profile that the agents were familiar with as a result of their training. The fact that the agents drew inferences from such a profile does not entitle those inferences to any greater or lesser weight in determining whether there was reasonable suspicion. *Id.* at 10.

Moreover, Hooper gave confused and contradictory responses to the agents' questions. When asked if he was coming from California, he stated that he was coming from Chicago. Although the flight had stopped in Chicago, his ticket made clear that he had departed from California. He initially was unable to recall his birth date. After giving two obviously false answers, he finally gave a reasonable response. The agents' suspicions were directed toward the suitcase by other statements made by Hooper. For example, he told the agents that "his people" had put "stuff" in the suitcase prior to his departure from Oakland. Despite the fact that some of his possessions were in the suitcase, he stated that he did not have a key that opened it. His explanation about the whereabouts of the key also was suspicious. Finally, Hooper appeared nervous throughout the encounter. These facts warranted the agents' reasonable suspicion that the suitcase Hooper was carrying contained contraband. *Cf. United States v. Nurse,* 916 F.2d 20, 24 (D.C.Cir.1990) (fact that individual arrived late at night on train from a source city, purchased ticket with cash, displayed nervous behavior, combined with vague answers to questions during consensual encounter with law enforcement officers, amounted to reasonable suspicion); *Sterling, supra,* 909 F.2d at 1083–84 (fact that individual was one of the last passengers to deplane from a flight arriving from a source city, purchased ticket with cash, and looked about airport concourse repeatedly, combined with suspicious statements made during consensual encounter with law enforcement officers, amounted to reasonable suspicion).

We hold that the agents had a reasonable suspicion based on specific and articulable facts to believe that the suitcase Hooper was carrying contained contraband.

### (B)

We consider next whether the scope of the agents' conduct exceeded the permissible bounds of a *Terry* type detention. The district court held that the extended seizure of the suitcase could not be justified based on reasonable suspicion. The government contends that the district court erred in considering the entire time period that elapsed after the seizure and prior to the search. We agree with the government on this issue.

■ The warrantless intrusion on an individual's liberty and possessory interests that was sanctioned in *Terry* and *Place* must be "reasonably related in scope to the circumstances which justified it initially." *United States v. Montoya de Hernandez,* 473 U.S. 531, 542 (1985). Such a seizure must be "minimally intrusive of [an individual's] Fourth Amendment interests" to be justifiable based on reasonable suspicion. *Place, supra,* 462 U.S. at 706. If the intrusion becomes excessive, it ceases to be a *Terry* type detention that can be justified based on reasonable suspicion and instead becomes a seizure that requires a showing of probable cause. *E.g., United States v. Sharpe,* 470 U.S. 675, 685 (1985) ("[o]bviously, if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop").

The district court here held that "[w]hile the continued nervous conduct of the defendant, and his evasive answers, combined with the information the agents obtained from their questioning, may have supported a finding of reasonable suspicion sufficient to justify a brief detention of the suitcase; . . . this Court cannot make either the factual or conceptual transition from reasonable suspicion for a brief detention to probable cause to justify the seizure of the suitcase." In considering the length of the detention, the district court concluded that "the detention of the suitcase was lengthy, with almost a full day passing

before the search warrant was obtained and the suitcase opened."

■ We agree with the government's contention that the district court erred in considering the entire period of time that elapsed between the initial seizure of the suitcase and the time a search warrant was obtained and the suitcase opened. Only the period of time that elapsed between the initial seizure of the suitcase and the completion of the investigation that gave rise to probable cause is relevant in determining the scope of the detention. Once the agents developed probable cause, a warrantless seizure pending application for a search warrant was justified. *Place, supra*, 462 U.S. at 701. Indeed, in *Place* the dog sniff was conducted late on a Friday afternoon. After a positive reaction from the dog, the agents seized the luggage, but did not procure a search warrant until the following Monday. *Id.* at 699. Yet, in determining the reasonableness of the detention, the Court considered the ninety minute interval that elapsed between the initial seizure of the luggage and the positive dog sniff that gave rise to probable cause, rather than the entire weekend during which the officers held the bag pending application for a search warrant. *Id.* at 709–10 *see also United States v. Mondello*, 927 F.2d 1463, 1471 (9 Cir.1991) (reasonable suspicion justified detention of luggage for 30 minutes; continued seizure of luggage subsequent to positive dog sniff justified by probable cause).

■ According to the agents' calculations here, less than 30 minutes elapsed between the time they seized the suitcase and the time they completed their investigation that gave rise to probable cause to believe that the suitcase contained contraband. This estimate is based on the approximate arrival time of Hooper's flight (4:25 p.m.), the amount of time the agents estimate they spent observing and speaking with Hooper (8 minutes), and the approximate time of Gerace's phone call to the United States Attorney's office to begin the process of obtaining a search warrant (5 p.m.). The calculation of this time period is dependent entirely on the agents'

credibility. The district court's credibility findings are binding on us. *Montilla, supra*, 928 F.2d at 586. Although the district court made no explicit finding on the agents' credibility, it did not reject the agents' version of events. Accordingly, we have no basis for rejecting it. We will proceed on the assumption that slightly less than 30 minutes elapsed after the initial seizure of the suitcase before the agents established probable cause to believe it contained contraband.

Our inquiry as to the permissible scope of a *Terry* type detention begins with *Place*. In *Place*, a suspect's luggage was detained for ninety minutes while law enforcement officers awaited the arrival of a narcotics detection dog. Although it declined to place a time limit on such seizures, the Court held that the ninety minute seizure "exceeded the permissible limits of a *Terry*-type investigative stop." *Place, supra*, 462 U.S. at 709. Accordingly, the seizure could not be justified absent probable cause. The Court held that the length of the detention was an important factor in determining its intrusiveness. *Id.* In considering the length of the detention, the Court focused on the diligence with which the agents pursued their investigation. *Id.* The police, in that case, had advance notice of the suspect's arrival and could have arranged for a dog to be at the airport when the suspect and his luggage arrived, thereby minimizing the intrusion on his fourth amendment rights. *Id.* The Court found the intrusion exacerbated by "the failure of the agents to accurately inform [the suspect] of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage if the investigation dispelled the suspicion." *Id.* at 710.

The Court has declined to establish a bright line rule for the duration of *Terry* stops. *E.g., Sharpe, supra*, 470 U.S. at 685 ("[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria"); *Place*,

*supra,* 462 U.S. at 709 ("we decline to adopt any outside time limitation for a permissible *Terry* stop"). Rather, we must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Sharpe, supra,* 470 U.S. at 685; *see also Royer, supra,* 460 U.S. at 500 ("an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop").

■■■ We consider now the conduct involved in the instant case. Initially, we note that the agents exchanged phone numbers with Hooper so that arrangements could be made for the return of the suitcase in the event their suspicions were not confirmed; they also gave Hooper a receipt for the suitcase. Moreover, the facts of the instant case differ from those of *Place* in three significant ways. First, the agents did not move the suitcase to another location without informing Hooper. Second, unlike the situation in *Place,* the agents were not informed of Hooper's arrival in advance. They, therefore, could not have been expected to arrange for a narcotics detection dog to be available on Hooper's arrival or to arrange for any other investigative technique prior to his arrival. Finally, the detention in the instant case was substantially shorter than that in *Place.*

Once the agents seized the suitcase they pursued their investigation diligently. Allman sought to verify some of the information that Hooper had disclosed. He learned that the person who answered the phone number that Hooper had provided could not identify Kenny Fields, and that Hooper did not go directly to the address he had provided. He also traced the address to which the phone number Hooper had provided was listed. Gerace, who thought that Hooper looked familiar, called a Detective at the Buffalo Police Narcotics Unit. Detective Parker was able to direct the agents to the bulletin from which they were able to establish Hooper's true identity and learn about Hooper's prior arrest. Moreover, the bulletin also tied Hooper and his associates to the addresses that were the subject of an ongoing investigation involving narcotics and weapons. Upon confirmation of their suspicion, the investigation ceased, and the agents focused their efforts on obtaining a search warrant.

The fact that the agents pursued a course of investigation other than exposing the luggage to a narcotics detection dog does not render their conduct unreasonable. Hooper contends that, since the agents did not arrange for a dog sniff, a technique that either gives rise to probable cause or dispels suspicion, they intended to seize the suitcase indefinitely until they established probable cause. He contends that the detention of his suitcase, therefore, exceeded the permissible limits of a *Terry* type detention. This contention focuses on the agents' subjective intentions at the point of the initial seizure. Were we to accept it, we would effectively limit the type of investigation law enforcement officers may conduct, when detaining luggage upon reasonable suspicion that it contains contraband, to exposing the luggage to a narcotics detection dog. We decline the invitation to limit the *Place* doctrine in this way.

■■■ The Court in *Place* applied a balancing test to determine the reasonableness of an investigative detention of personal luggage.

"We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause."

*Place, supra,* 462 U.S. at 703. Finding the government's interest in narcotics interdiction "substantial," *id.,* the Court held that "when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provid-

ed that the investigative detention is properly limited in scope." *Id.* at 706. Briefly detaining luggage to expose it to a narcotics detection dog is an example of the sort of police conduct that, if conducted diligently, is so minimally intrusive of fourth amendment interests that it may be justified upon reasonable suspicion. It does not follow, however, that it is the only means by which the police may conduct a brief investigation to confirm or dispel their suspicions.

 Law enforcement officers must be permitted the flexibility to adapt to the circumstances at hand. Accordingly, they may detain an individual's luggage based on a reasonable suspicion that it contains contraband and conduct a brief investigation provided it is minimally intrusive of fourth amendment interests and does not last longer than necessary to achieve its purposes. Beyond that proviso, we will not "indulge in unrealistic second-guessing" as to the means law enforcement officers may employ to conduct their investigations. *Sharpe, supra,* 470 U.S. at 686; *see also United States v. Alexander,* 907 F.2d 269, 273 (2 Cir.1990) ("[t]he fact that an investigative stop might, in the abstract, have been accomplished by some less intrusive means does not, in and of itself, render a stop unreasonable"), *cert. denied,* 111 S.Ct. 983 (1991). The *Place* doctrine calls for a case by case approach that examines whether the officers' conduct exceeded the bounds for which it was justified. A bright line rule that limits the means of investigation would unduly restrain law enforcement officers' ability to meet varying circumstances.

In any event, the record does not support Hooper's characterization of the officer's conduct. He suggests that the agents had no plan to conduct an investigation that would quickly confirm or dispel their suspicion. Rather, he suggests that they must have intended to hold the suitcase indefinitely until such time as their suspicions were confirmed or dispelled, regardless of how long a detention that entailed. He supports his argument by pointing to the fact that the agents told him when they initially seized the luggage that they intended to apply for a search warrant. The inferences that Hooper draws from this are not warranted.

In the instant case, as in most cases, the only real gauge of the agents' subjective intentions is their actual conduct. The fact that the agents could not state a precise time that their investigation would end does not mean that they seized the suitcase indefinitely. The agents' conduct was circumscribed and designed to confirm or dispel their suspicions in a brief period of time. The agents did not leave the airport. Moreover, they did not initiate any sort of investigation that they had any reason to believe would continue over an extended period. Their conduct consisted of making two phone calls, asking the taxi dispatcher where Hooper had gone, locating the address to which the phone number Hooper had provided was listed, and retrieving the bulletin from the office next door. When the investigation did confirm their suspicions, the agents immediately took steps to obtain a search warrant. Speculation about what the agents would have done had their investigation not confirmed their suspicions is the sort of second-guessing in which we decline to engage.

Even if we were inclined to accept Hooper's characterization of the agents' intent, it would not be clear that his fourth amendment rights would have been violated based solely on the agents' intent at the outset. Our focus is on the nature and extent of the intrusion actually caused by the agents. Thus, Hooper's argument is essentially that the agents would have violated his fourth amendment rights, but for their good fortune in quickly discovering information sufficient to establish probable cause. Adopting this approach would necessitate our engaging in speculation as opposed to an examination of the events as they actually transpired.

Finally, the investigation actually conducted by the agents was minimally intrusive of Hooper's fourth amendment interests. It lasted less than 30 minutes. It did not "involve any delay unnecessary to the legitimate investigation of the law enforcement officers." *Sharpe, supra,* 470 U.S.

at 687. The agents did not open or otherwise disturb the contents of the suitcase. Indeed, it was no more intrusive of Hooper's fourth amendment interests than similar detentions for the purpose of exposing luggage to a narcotics detection dog that courts have upheld as reasonable. *E.g., Mondello, supra,* 927 F.2d at 1471 (30 minute detention reasonable); *Nurse, supra,* 916 F.2d at 24 (20 to 30 minute detention reasonable); *Sterling, supra,* 909 F.2d at 1081, 1085 (75 minute detention reasonable); *United States v. Sullivan,* 903 F.2d 1093, 1097–98 (7 Cir.1990) (45 minute detention reasonable). In view of the government's "significant" interest in narcotics interdiction, this minimal intrusion on Hooper's fourth amendment interests was justified based on the agents' reasonable suspicion that the suitcase contained contraband.

We hold that the agents' conduct did not exceed the permissible bounds of a *Terry* type detention. The intrusion on Hooper's fourth amendment interests caused by the agents' conduct was minimal and was justified based on the agents' reasonable suspicion that the suitcase contained contraband.

## V.

██ This brings us to the continued seizure of the suitcase after the investigation was complete. We agree with the government that this continued seizure was justified by probable cause that the suitcase contained contraband.

A magistrate determined that the agents had probable cause to believe that the suitcase contained contraband. We accord the magistrate's determination "substantial deference." *United States v. Nichols,* 912 F.2d 598, 602 (2 Cir.1990). We agree with the magistrate's determination.

"Probable cause means 'a fair probability that contraband or evidence of a crime will be found.'" *Sokolow, supra,* 490 U.S. at 7 (citation omitted). The facts gathered by the agents met that standard. During their investigation, the agents learned that Hooper was travelling under an alias, that he had been arrested previously for posses-

sion of an automatic weapon, that he was associated with others involved in narcotics and weapons violations, that the addresses he had provided to the agents were the subject of an ongoing investigation concerning narcotics and weapons trafficking between California and Buffalo, and that he was considered dangerous. These facts, combined with the facts already known to the agents, established probable cause to believe that the suitcase contained contraband.

"Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents...." *Place, supra,* 462 U.S. at 701. Accordingly, the seizure of the suitcase pending application for a search warrant was permissible. The search of the suitcase itself was conducted pursuant to a valid warrant.

We hold that the continued seizure of the suitcase pending application for a search warrant was justified based on probable cause to believe that the suitcase contained contraband.

## VI.

To summarize:

We hold that the encounter between Hooper and the agents at the airport was not a seizure within the meaning of the fourth amendment. We further hold that the initial seizure of the suitcase was justified based on a reasonable suspicion that it contained contraband. We hold that the ensuing investigation, which was completed in less than 30 minutes, and gave rise to probable cause to believe that the suitcase contained contraband, did not exceed the permissible bounds of a *Terry* type detention. Finally, we hold that the continued seizure of the suitcase pending application for a search warrant was justified based on probable cause.

Reversed and remanded.

GEORGE C. PRATT, Circuit Judge, dissenting:

> "When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean— neither more nor less."
>
> "The question is," said Alice, "whether you *can* make words mean so many different things."
>
> "The question is," said Humpty Dumpty, "which is to be master—that's all."

L. Carroll, *Alice Through the Looking–Glass* (1872).

This case presents another example of the erosion of our constitutional protections resulting from this country's wasteful, ineffective, self-destructive efforts to stop drug trafficking. Because I believe that the majority's holding now allows government agents to seize virtually any air traveller's luggage while they make an investigation, I dissent.

To justify their seizure of Hooper's bag the agents testified he had come from a "source city" and fit the DEA's "drug courier profile". Yet the government conceded at oral argument that a "source city" for drug traffic was virtually any city with a major airport, a concession that was met with deserved laughter in the courtroom. The "drug courier profile" is similarly laughable, because it is so fluid that it can be used to justify designating anyone a potential drug courier if the DEA agents so choose. "The [DEA] has not committed the profile to writing" and "the combination of factors looked for varies among agents." *United States v. Taylor*, 917 F.2d 1402, 1407 n. 8 (6th Cir.1990), *vacated*, 925 F.2d 990 (6th Cir.1991). Moreover, a canvass of numerous cases reveals the drug courier profile's "chameleon-like way of adapting to any particular set of observations." *United States v. Sokolow*, 831 F.2d 1413, 1418 (9th Cir.1987), *rev'd*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989):

Arrived late at night *United States v. Nurse*, 916 F.2d 20, 24 (D.C.Cir.1990).

Arrived early in the morning *United States v. Reid*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980); *United States v. Millan*, 912 F.2d 1014, 1017 (8th Cir.1990).

One of first to deplane *United States v. Millan*, 912 F.2d at 1015; *United States v. Moore*, 675 F.2d 802, 803 (6th Cir. 1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1521, 75 L.Ed.2d 945 (1983).

One of last to deplane *United States v. Mendenhall*, 446 U.S. 544, 547 n. 1, 100 S.Ct. 1870, 1873 n. 1, 64 L.Ed.2d 497 (1980); *United States v. Sterling*, 909 F.2d 1078, 1079 (7th Cir.1990); *United States v. White*, 890 F.2d 1413, 1414 (8th Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990).

Deplaned in the middle *United States v. Buenaventura–Ariza*, 615 F.2d 29, 31 (2d Cir.1980).

Used a one-way ticket *United States v. Johnson*, 910 F.2d 1506 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991); *United States v. Colyer*, 878 F.2d 469, 471 (D.C.Cir.1989); *United States v. Sullivan*, 625 F.2d 9, 12 (4th Cir.1980).

Used a round-trip ticket *United States v. Craemer*, 555 F.2d 594, 595 (6th Cir. 1977).

Carried brand-new luggage *United States v. Taylor*, 917 F.2d at 1403; *United States v. Sullivan*, 625 F.2d at 12.

Carried a small gym bag *United States v. Sanford*, 658 F.2d 342, 343 (5th Cir.1981), *cert. denied*, 455 U.S. 991 (1982).

Travelled alone *United States v. White*, 890 F.2d at 1415; *United States v. Smith*, 574 F.2d 882, 883 (6th Cir.1978).

Travelled with a companion *United States v. Garcia*, 905 F.2d 557, 559 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990); *United States v. Fry*, 622 F.2d 1218, 1219 (5th Cir.1980).

Acted too nervous *United States v. Montilla*, 928 F.2d 583, 585 (2d Cir.1991); *United States v. Cooke*, 915 F.2d 250, 251 (6th Cir.1990).

Acted too calm *United States v. McKines*, 933 F.2d 1412 (8th Cir.1991); *United States v. Himmelwright*, 551 F.2d 991, 992 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

Wore expensive clothing and gold jewelry *United States v. Chambers*, 918 F.2d 1455, 1462 (9th Cir.1990).

Dressed in black corduroys, white pullover shirt, loafers without socks *United States v. McKines, supra.*

Dressed in dark slacks, work shirt, and hat *United States v. Taylor,* 917 F.2d at 1403.

Dressed in brown leather aviator jacket, gold chain, hair down to shoulders *United States v. Millan,* 912 F.2d at 1015.

Dressed in loose-fitting sweatshirt and denim jacket *United States v. Flowers,* 909 F.2d 145, 146 (6th Cir.1990).

Walked rapidly through airport *United States v. Millan,* 912 F.2d at 1017; *United States v. Rose,* 889 F.2d 1490, 1491 (6th Cir.1989).

Walked aimlessly through airport *United States v. Gomez–Norena,* 908 F.2d 497, 497 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 363, 112 L.Ed.2d 326 (1991).

Flew in to Washington National Airport *on the LaGuardia* Shuttle *United States v. Powell,* 886 F.2d 81, 82 (4th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1144, 107 L.Ed.2d 1049 (1990).

Had a white handkerchief in his hand *United States v. Garcia,* 848 F.2d 58, 59 (4th Cir.), *cert. denied,* 488 U.S. 957, 109 S.Ct. 395, 102 L.Ed.2d 384 (1988).

In our "Looking–Glass" world of drug enforcement, the DEA apparently seeks "to be master" by having "drug courier profile" mean, like a word means to Humpty Dumpty, "just what I choose it to mean—neither more nor less."

But even assuming that the "source city" and "drug courier profile" elements gave the agents *some* level of suspicion, the facts of this case do not permit the conclusion that the DEA agents had a reasonable suspicion, let alone probable cause, to detain Hooper's suitcase. Neither *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), nor *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), countenance the extensive intrusion on privacy rights that occurred here. In *Terry* the Court approved a pat-down investigation based on less than probable cause, because they were dealing with the need for "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. The *Place* Court said a canine sniff could be based on less than probable cause because the sniff—*"sui generis"* according to the Court—"is much less intrusive than a typical search." *Place,* 462 U.S. at 707, 103 S.Ct. at 2644.

The point of *Place* is that *Terry* may be extended to allow something specific and quick, like a sniffing dog, that will either confirm or dispel the "reasonable suspicion"; it was surely not meant to allow government agents to "buy time" in order to develop probable cause. Here, the only reason advanced by the agents for detaining the luggage was that they needed time to obtain a search warrant, even though they admittedly lacked probable cause at that point to do so. There is no evidence of any plan to undertake "swift action" or to adopt a "less intrusive" means of satisfying their curiosity. I fear the majority's extension of *Terry* and *Place* now allows government agents to make seizures based on "reasonable suspicion" so that they can, indeed, buy time to develop probable cause later.

This is yet another example of the aggressive tactics recently employed by federal law enforcement officials in the Buffalo area, which are well chronicled in our cases. *See, e.g., United States v. Montilla,* 928 F.2d 583 (2d Cir.1991); *United States v. $37,780 in Currency,* 920 F.2d 159 (2d Cir.1990); *United States v. Lee,* 916 F.2d 814 (2d Cir.1990); *United States v. $359,500 in Currency,* 828 F.2d 930 (2d Cir.1987). Sadly, no improvement yet appears on the horizon, and this decision, like those cited above, may simply encourage even more intrusive governmental conduct there and elsewhere.

During the suppression hearing, agents Gerace and Allman testified that they spend their days approaching potential drug suspects at the Greater Buffalo International Airport. According to their own testimony, they detained 600 suspects in 1989, yet their hunches that year resulted in only ten arrests. It appears that they have sacrificed the fourth amendment by detaining 590 innocent people in order to arrest ten who are not—all in the name of the "war on drugs". When, pray tell, will it end? Where are we going?