**UNITED STATES of America,**

v.

**Sean STONE, Defendant.**

**No. 98 CR. 1115(SAS).**

United States District Court,
S.D. New York.

Nov. 5, 1999.

Matthew L. Biben, Asst. U.S. Atty., New York City, for U.S.

Martin Geduldig, Hicksville, NY, for Defendant.

## AMENDED OPINION & ORDER

SCHEINDLIN, District Judge.

Defendant Sean Stone ("Stone" or "Defendant") is charged with knowingly possessing a firearm in violation of 18 U.S.C. § 922(g)(1), which prohibits the possession of firearms by convicted felons. Defendant moves to suppress physical evidence seized from him during a search performed by New York City police officers on June 10, 1998. Defendant asserts that he was stopped and searched without either probable cause or reasonable suspicion. A suppression hearing was held, at which two officers and the defendant testi-

fied. For the reasons set forth below, the defendant's motion is denied.

## I. Findings of Fact

On the evening of June 9, 1998, and into the morning of June 10, 1998, Police Officer Paul Denver, Sergeant Brendan Keane, and Detective—then Officer—Robert Martin were patrolling the area of the intersection of East 233rd Street and Paulding Avenue, the Bronx, in an unmarked police car pursuant to their responsibilities as members of the New York City Police Department's ("NYPD") Street Crime Unit. *See* Transcript of Suppression Hearing held on August 27, 1999, September 16, 1999, and September 23, 1999 ("Tr."), at 3–4. Officer Denver has been a member of the NYPD for six years; Detective Martin has been with the NYPD for nine years. *Id.* at 3, 48.[1] All three officers are white. *Id.* at 25.

At approximately 12:25 a.m. on the morning of June 10, 1998, the officers were traveling west along 233rd Street in their unmarked car. *Id.* at 28–29. Officer Denver noticed the defendant, a black male, walking east along the sidewalk of East 233rd Street, towards their unmarked car. *Id.* at 7, 33. The defendant was approximately four car-lengths away at this point, and was visible because the sidewalk was illuminated by overhead streetlights. *Id.* at 7, 64. Officer Denver could see that the defendant was carrying a large paper bag in his left hand.[2] *Id.* at 9. He also testified that he noticed an object in the defendant's right, front pants pocket which was swinging back and forth as the defendant walked. *Id.* at 8–9. The object had room to swing in the defendant's pocket because he was wearing loose-fitting pants. *Id.* at 41. Officer Denver also testified that defendant touched his right pocket, appar-

ently to adjust this object, several times as he walked down the street. *Id.* at 8–9.

After concluding that there was something heavy in the defendant's pocket, Officer Denver asked his partners to observe him as he walked closer to their car. *Id.* at 9. Detective Martin testified that when he first noticed the defendant, he was about fifty feet away from the car and did not appear to be touching his pocket or behaving suspiciously in any way. *Id.* at 51–52, 69. As Stone approached to within twenty-five feet of the car, however, Detective Martin testified that he too noticed a heavy object in defendant's pocket which he repeatedly adjusted with his right hand. *Id.* at 51–53, 70. Both Detective Martin and Officer Denver thought this noteworthy because, in their experience, people often make similar adjustments—consciously and unconsciously—when carrying weapons. *Id.* at 15, 79.

After driving past the defendant the officers decided to turn their car around to take another look at him. *Id.* at 10. As they were turning around, Stone crossed from the sidewalk into a near-by parking lot, and the officers pulled their car into the lot after him. *Id.* at 10–12. Officer Denver and Detective Martin testified that when the car pulled within five to seven feet of the defendant, Officer Denver said through his open window,[3] "How are you doing? Police," to which Stone replied, "I am just going home."[4] *Id.* at 13, 57. Then, before Officer Denver could respond, Stone ran away from the car while clutching his right, front pocket. *Id.* at 13, 57–58.[5] The officers then left their car and chased him. *Id.* at 75. The defendant, with the officers close behind, ran down Paulding Avenue and turned east on East 232nd Street. *Id.* at 16. Throughout

---

1. For simplicity's sake, I shall refer to Officer Denver, Sergeant Keane, and Detective Martin collectively as "police officers."

2. The contents of this bag included diapers, tissues, and related items. *See* Tr. at 31.

3. Officer Denver testified that he always keeps his window rolled down. *See* Tr. at 13.

4. The defendant lives at 4182 Paulding Avenue, not far from the parking lot.

5. According to Officer Denver, the defendant was not running "naturally;" instead, he ran with his right hand held stiffly in front of him, "doing something" with it. *See* Tr. at 18.

this chase, Officer Denver claims he yelled for Stone to stop and repeatedly identified himself as a police officer. *Id.* at 18, 61.

Stone soon found his path blocked by a barbed-wire fence. *Id.* at 19. As he tried to climb over it, Officer Denver grabbed him around the waist and pulled him to the ground. *Id.* at 20. As he did so, Officer Denver felt a gun inside Stone's right, front pocket and yelled, "hot lunch"—a code phrase indicating to Detective Martin that Stone had a gun. *Id.* at 20. Officer Denver then took the weapon—a Colt .380 semi-automatic handgun—from Stone's pocket, and handed it to Detective Martin. *Id.* at 21. After handcuffing defendant, Officer Denver discovered, among other things, a magazine full of bullets in the defendant's left, front pants pocket. *Id.* at 22.

The defendant's description of these events is somewhat different. First, Stone denies reaching to adjust the contents of his pockets at any time. *Id.* at 105, 107. Indeed, he claims that he could not have done so because he was carrying a sandwich in his right hand and a bag in his left at the time Officer Denver and Detective Martin contend they saw him reaching for his right pocket. *Id.* at 122–23. And even if he had reached for his pocket, the defendant insists that neither Detective Martin nor Officer Denver could have drawn any conclusions about its contents since he was wearing a long, untucked shirt at the time of his arrest which fell below his pockets, concealing them from view. *Id.* at 86.[6] Second, Stone insists that the men in the unmarked car never identified themselves as police officers at any time during the initial verbal exchange or during the ensuing chase.[7] Finally, Stone claims that he started to run only after one of the men got out of the unmarked car and tried to grab him by the shoulder because he was afraid the man was trying to rob him. *Id.* at 83–85.[8] Stone agrees, however, that once he started to run, Officer Denver and Detective Martin pursued him on foot. *Id.* at 75.

Having reviewed the testimony and the physical evidence submitted at the hearing, I find the testimony of Officer Denver and Detective Martin to be the more credible account of the events that transpired on June 10, 1998. Stone's testimony notwithstanding, I find that the defendant knew the men in the unmarked car were police officers,[9] that Officer Denver identified himself as an officer when he first questioned the defendant and when he and Detective Martin pursued Stone to the fence, and that Stone fled because he knew that, as a convicted felon, he faced a substantial prison term for possession of a weapon.

■ Stone's credibility suffers from his status as a repeat offender. His record reveals three felony and three misdemeanor convictions. *See* Government's Memorandum of Law, dated October 5, 1999 ("Govt.Mem.") Ex. 12. While Stone's criminal history does not in itself preclude the possibility that he is telling the truth, it is a relevant consideration when evaluating conflicting testimony. Further, Stone admitted that on June 10, 1998, he knew

---

6. The defendant's testimony that his shirt was long and worn outside his pants, thereby covering his pocket, is substantiated by a photograph taken of him subsequent to his arrest. *See,* Defendant's Motion to Suppress, dated July 21, 1999 ("Def.Mtn") Ex. A. I credit his testimony in this regard and conclude that the officers, contrary to their testimony, were not able to observe the object in his pocket. This conclusion does not affect the outcome of this case, however, since the defendant's untucked shirt would not have prevented the officers from observing Stone touching and adjusting his pocket.

7. Stone testified that, "[t]here was never any reference to that [sic] they represented authority, as police, never any directive of that nature." *See* Tr. at 83–85.

8. The defendant was wearing a gold chain, a medallion, and a platinum watch at the time of the encounter. *See* Tr. at 84, 90.

9. Although not in uniform, Officer Denver and Detective Martin testified that they wore their badges on chains around their necks at all times. *See* Tr. at 27, 61.

that, as a convicted felon, he would be sent back to prison if he were caught carrying a handgun. *See* Tr. at 108. I conclude it was this knowledge, rather than the fear of being robbed, that motivated Stone to flee when Officer Denver first addressed him.

Finally, some aspects of Stone's testimony simply strain credulity. Specifically, Stone testified that he never, ever adjusted his pocket as he walked, *id.* at 105, 107; that he did not hear the officers get out of the car, even after testifying the car was within five feet of him when the officers stepped out from it into the lot, *id.* at 115; and that he first realized that Officer Denver and Detective Martin were police officers when they subdued him at the fence. *Id.* at 85. None of these assertions have the ring of truth.[10]

## II. DISCUSSION

The defendant seeks to suppress the seized handgun, claiming that the stop violated the Fourth Amendment to the United States Constitution. The Government contends that Officer Denver and Detective Martin conducted a lawful investigative stop when they seized the defendant at the fence and that this stop was based upon reasonable suspicion that Stone was engaged in criminal activity.

### A. Requisite Elements of a Lawful Investigative Stop

The Second Circuit Court of Appeals has identified three levels of interaction that may take place between law enforcement officers and private citizens. These include: consensual encounters; investigative detentions; and arrests. *See United States v. Tehrani,* 49 F.3d 54, 58 (2d Cir. 1995). The Government contends that the defendant was subjected to a lawful investigative detention when the officers seized him at the fence; the defendant disagrees.

■ It is settled law that a police officer may initiate a consensual encounter with a private citizen in a public forum, for any reason, without violating the Fourth Amendment. *See United States v. Hooper,* 935 F.2d 484, 490 (2d Cir.1991).[11] Citizens thus approached remain free not to answer an officer's questions, however, and cannot be detained for their failure to respond. *Id.* The test for determining when a consensual encounter has become impermissibly coercive is "whether a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

■ Investigative detentions, so-called *Terry* stops, may be employed on more limited grounds. Police officers can make investigative stops only when they have "reasonable suspicion" that criminal activity is underway. *See Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Gomez,* 633 F.2d 999, 1004 (2d Cir.1980). According to this standard, a detaining officer must be " 'aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion' that a suspect is engaged in criminal activity." *United States v. Jackson,* 652 F.2d 244, 248 (2d Cir.1981) (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873,

10. Nor does Stone's testimony that he was carrying a sandwich in his right hand at the time of the encounter which would have prevented him from adjusting his right, front pocket in the manner described by the officers. As the Government noted at the hearing, this assertion was raised by the defendant only after he had had the opportunity to hear the testimony of Officer Denver and Detective Martin. *See* Tr. at 128–30. When viewed in this context, Stone's sandwich statement appears dubious.

11. "Consensual encounter" in this context is a term of art which describes a verbal exchange between a law enforcement officer and a citizen. It implies that the officer does not prevent the citizen's departure, not that the citizen has expressed his willingness to speak with the officer. *See Brown v. City of Oneonta,* 195 F.3d 111 (2d Cir. 1999) N.Y.L.J., Oct. 28, 1999, at 25 (exchange between citizen and police officer where citizen is asked to allow the officer to inspect his hands for distinguishing marks is a consensual encounter, not a seizure).

884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)); *see also United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (officer "must be able to articulate something more than inchoate and unparticularized suspicion or 'hunch' "). The reasonableness of an officer's suspicion must be tested against the backdrop of the *totality* of circumstances surrounding a challenged stop. *See Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *United States v. Salazar,* 945 F.2d 47, 50 (2d Cir.1991).

### B. The Seizure Was Lawful Because It Was Based Upon Reasonable Suspicion

■ The Government cites several articulable factors as sufficient to give rise to a reasonable suspicion that Stone was engaged in or about to be engaged in criminal activity. These factors include the officers' observation that Stone was carrying something heavy in his pocket; that he touched this object repeatedly as he walked; that he fled after Officer Denver identified himself as a police officer; and that he clutched an object in his pocket as he ran away. *See* Govt. Mem. at 5. I am persuaded that these factors, especially the fact that the defendant fled without reason, are indeed sufficient to justify an investigative stop and, where reasonable for the detaining officers' protection, a cursory sweep for weapons.

■ Although the factors cited above may appear innocuous in isolation, even innocent acts, when considered collectively, may give rise to the reasonable suspicion that criminal activity is underway. *See Hooper,* 935 F.2d at 493 (*citing United States v. Sokolow,* 490 U.S. at 9–10, 109 S.Ct. 1581 (innocent acts incident to travel, when considered together, may provide reasonable suspicion that traveler's luggage contained narcotics)).

■ Here, Officer Denver and Detective Martin testified that Stone appeared to be carrying something in his pocket, and they suspected this object might be a weapon. This fact, standing alone, is not sufficient to justify an investigative stop. Indeed, the Government conceded that the officers could not (and did not) make a *Terry* stop when Officer Denver first addressed the defendant. *See* Tr. at 141.[12] But when Stone fled from the officers after they identified themselves, the object in Stone's pocket must be considered together with his flight. Together these facts give rise to a reasonable suspicion justifying the officers' decision to stop the defendant at the fence. Neither the suspected object in Stone's pocket nor his flight appear sufficient in and of themselves to justify the stop, but taken together they could suggest to a reasonable law enforcement officer that criminal activity was underway.[13] *See United States v. Harley,* 682 F.2d 398, 401 (2d Cir.1982) (suspect's emergence from building known to be a narcotics spot, coupled with high-speed flight from police officers, justified investigatory stop); *U.S. v. Colon,* 1998 WL 122595, at *2, 97 CR 449 (S.D.N.Y. March 19, 1998) (investigative stop may be based upon a suspect's flight, his presence in suspected crime area, and fact that he appeared to be

---

12. Stone was not "seized" until he was apprehended by Officer Denver. *See California v. Hodari,* 499 U.S. 621, 625–26, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (Constitutional seizure occurs only after a suspect has yielded to the application of force or a show of authority by a law enforcement officer.). Because there was no seizure until that point, the officers' initial encounter with the defendant was not a *Terry* stop.

13. The issue of whether flight alone may give rise to a reasonable suspicion to justify an investigative stop is currently before the Unit-

ed States Supreme Court. The Court has granted certiorari in *People v. Wardlow,* 183 Ill.2d 306, 233 Ill.Dec. 634, 701 N.E.2d 484 (1998), *cert. granted,* —— U.S. ——, 119 S.Ct. 1573, 143 L.Ed.2d 669 (1999) (No. 98–1036). In *Wardlow,* the Illinois Supreme Court held that the trial court erred in denying a motion to suppress evidence where the defendant took flight as police approached him in a high-crime area, concluding that "unequivocal flight of a suspect upon seeing police [i]s not alone indicative of criminal activity." *Id.* at 487, 183 Ill.2d 306, 233 Ill.Dec. 634.

concealing an object under his coat). For these reasons, the officers had reasonable suspicion that criminal activity was afoot, and their investigative stop of Stone was lawful.

The defendant contends that the stop was unlawful because the officers' actions were not "justified at [their] inception" by any reasonable suspicion of criminal activity. *See* Defendant's Memorandum of Law, dated October 12, 1999 ("Def.Mem.") at 7 (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. 1868). But this argument must fail, for the action which must be "justified at its inception" is not the consensual encounter, but the investigative—or *Terry*—stop itself. *See Terry*, 392 U.S. at 20, 88 S.Ct. 1868. The fact that Officer Denver and Detective Martin did not have reasonable suspicion of criminal activity when they first addressed the defendant is of no moment; consensual encounters between police officers and private citizens need no justification. *See Kolender v. Lawson*, 461 U.S. 352, 364, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (Brennan, J., concurring) ("Any person may, of course, direct a question to another person in passing" without justification); *Hooper*, 935 F.2d at 490. It was only after the defendant fled that reasonable suspicion arose, thus making the subsequent *Terry* stop lawful.

■ Finally, an exploration is warranted as to the degree to which impermissible considerations of race may have played a part in this case. Based upon the facts presented here, it is very likely that the officers' actions were based initially on racial stereotyping. The defendant suggests that this is a case of racial profiling, *see* Def. Mem. at 8, a subject of much recent debate. *See* Randall Kennedy, *Suspect Policy*, The New Republic, Sept. 13 and 20, 1999, at 30; Jeffrey Goldberg, *The Color of Suspicion*, N.Y. Times Magazine, June 20, 1999, at 51. I am not persuaded that this is so. Unlike the classic racial

profile scenario, there is no indication that the officers selected the defendant from a pool of pedestrians based on his race. On the other hand, it seems likely that the initial effort to speak to the defendant, which resulted in his decision to flee, was probably based on the fact that he was a relatively young black male walking alone, late at night, in an area of the Bronx patrolled by the Street Crime Unit—by definition a high-crime area. This conclusion is bolstered by the officers' own testimony. Specifically, Detective Martin testified that when Officer Denver first prompted him to look at the defendant, he could see nothing at all that might arouse Officer Denver's suspicion that the defendant was engaged or about to be engaged in criminal activity of any kind. *Id.* at 69. It is difficult for me to believe that Officer Denver could have seen much more than his colleague, for he made his initial observation of the defendant from at least 50 feet away,[14] in the middle of the night, relying on streetlights for illumination. Of course, this begs the question: if there was nothing unusual or suspicious about the defendant, why then did the officers continue to surveil him? The answer appears obvious—based on their experience, and given the defendant's race and the time and place in which he was walking, the officers concluded that Stone was likely to be carrying a weapon.

Nevertheless, even assuming that the defendant was singled out for closer inspection on the basis of his race in concert with the time and the location in which he walked, I am satisfied that the officers' subsequent actions fully comply with the Fourth Amendment's guarantee against unreasonable searches and seizures. Although I am troubled by the considerations that may have initially triggered police interest in the defendant, Stone's actions, when considered in their totality, created sufficient suspicion to justify his

---

**14.** Because the officers' car was moving toward the defendant at the time, and Detective Martin took notice of the defendant at fifty feet away only after Officer Denver made his initial observation, it stands to reason that Officer Denver had decided that there was something noteworthy about the defendant when he was still more than fifty feet away.

detention and the officers' subsequent seizure of his weapon. This suspicion, based upon an aggregate of objective, articulable factors, is not tainted by the biases that may have motivated the officers' decision to initiate a consensual encounter with the defendant.[15]

## III. CONCLUSION

For the reasons set forth above, Stone's motion to suppress is denied.

## SO ORDERED.

---

**15.** The fact that the officers' actions comport with the requirements of the Fourth Amendment requires a denial of the defendant's motion to suppress the evidence. This does not mean that these actions are necessarily free from further review, perhaps in the context of a civil action. *See, e.g.,* Complaint in *National Congress for Puerto Rican Rights By Perez v. City of New York,* 75 F.Supp.2d 154 (S.D.N.Y. 1999).