Javier **MARTINEZ**, Plaintiff,

v.

**VILLAGE OF MOUNT PROSPECT; Ronald Pavlock, individually and in his official capacity; Tom Daley, individually and in his official capacity; Dick Draffone; individually and in his official capacity; David Nicholson, individually and in his official capacity; and Jack Dahlberg, individually and in his official capacity, Defendants.**

**Harry Moser, Plaintiff,**

v.

**Village of Mount Prospect and Tom Daley, individually and in his official capacity, Defendants.**

**Nos. 96 C 6027, 98 C 7580.**

United States District Court, N.D. Illinois, Eastern Division.

April 5, 2000.

---

Keith L. Hunt, Nancy A. Ostdiek, Hunt & Associates, P.C., Chicago, IL, for Javier Martinez, plaintiff.

Everette M. Hill, Jr., Richard T. Wimmer, Lance C. Malina, James Vincent Ferolo, Klein, Thorpe & Jenkins, Ltd., Chicago, IL, Laura Lee Scarry, Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., Chicago, IL, Elizabeth Ann Knight, Kathryn M. Reidy, Knight, Hoppe, Fanning & Knight, Ltd., Des Plaines, IL, for Village of Mount Prospect, defendant.

Terry A. Ekl, Connolly, Ekl & Williams, P.C., Clarendon Hills, IL, for Ronald Pavlock, Jack Dahlberg, defendants.

Charles E. Hervas, James Gus Sotos, Kevin G. Kulling, Kimberly D. Fahrbach, Hervas, Sotos & Condon, P.C., Itasca, IL, for Tom Daley, defendant.

William W. Kurnik, Kurnik, Cipolla, Stephenson & Barasha, Arlington Heights, IL, for Dick Draffone, defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Our nation, throughout its history, has continually struggled with the issue of race. As we begin the twenty-first century, it is critical that our legal system assist in the elimination of all racial discrimination. We must constantly strive to ensure that race plays no role in the day-to-day operation of our justice system. These two lawsuits are reflective of some of the racial issues we must as a society address in our criminal justice system.

Currently pending before the Court are the parties' joint motion to approve their respective settlement agreements in these two lawsuits and their joint motions to dismiss both cases with prejudice.[1] For the reasons that follow, we approve the settlements and commend the parties for their efforts in addressing the critical issues presented in this litigation.

In *Martinez v. Village of Mount Prospect*, No. 96 C 6027, a Hispanic former police trainee accused the Village of Mount Prospect's Police Department of national origin employment discrimination. At trial, this Court, over objection, allowed Martinez to introduce significant evidence that the Police Department targeted Hispanic members of the community in an effort to meet various arrest quotas. Specifically, we allowed Martinez, as well as other present and former Mount Prospect officers and trainees, to testify that they were instructed by commanding officers to target Hispanic drivers for traffic stops. Additionally, we permitted Martinez to submit evidence regarding the disproportionately high percentage of traffic tickets received by Hispanic drivers as compared to their numbers in the community. We admitted this evidence because it is relevant to Martinez's claim that he was subjected to a hostile work environment because of his national origin and that the Mount Prospect Police Department had a widespread custom of discriminating against Hispanic people, including him. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir.1997) ("Schwapp's awareness that a supervisor ... told officers to target minorities for traffic stops could very well be relevant to Schwapp's reasonable perception of a hostile work environment.")

On January 19, 2000, this Court entered judgment in *Martinez* after the jury returned a verdict in favor of Martinez in the amount of $1,179,000 against Defendants Mount Prospect, Thomas Daley, Richard Draffone and David Nicholson.[2] Immedi-

---

1. These two lawsuit were randomly reassigned to this Court from Judge Ann Claire Williams' calendar upon her recent appointment to the Seventh Circuit Court of Appeals.

2. The jury returned a verdict in favor of the other two defendants, Ronald Pavlock and John Dahlberg.

ately after the jury's verdict, the Court announced in open court that it had drafted a letter (attached to this opinion as Appendix A) requesting the Department of Justice to conduct an investigation into racial profiling at the Mount Prospect Police Department. Importantly, the Court prepared this letter *before* the jury reached its verdict but did not publicly release the contents of the letter until *after* the jury's verdict was received in open court. The decision to refer the case to the Justice Department was based on our independent evaluation of the profiling evidence, which the Court found compelling.

In view of the jury's verdict and the trial evidence, this Court thereafter entered a temporary restraining order, (R. 142), in which we enjoined the Village, Thomas Daley, and Richard Draffone

> from engaging in a custom, policy or practice of discriminating against the plaintiff or other Hispanic persons, and . . . from directing, suggesting, ordering or otherwise communicating that any police officer should focus, concentrate, target, profile, or otherwise modify law enforcement efforts in any way on the sole basis of the national origin of any person.

This order was generally continued by agreement of the parties until the Court ruled on the various post-trial motions or the case was settled. (R. 159.)

In our second case, *Moser v. Village of Mount Prospect,* No. 98 C 7580, a Mount Prospect police officer accused the Village of retaliation after he supported Martinez's discrimination charges. *Moser* and another police officer's employment discrimination case against the Village, *Medrano v. Village of Mount Prospect,* No. 98 C 4638, were awaiting trial when the *Martinez* verdict was returned. Ultimately, with the able assistance of our colleague District Court Judge Rebecca R. Pallmeyer, all three plaintiffs—Martinez, Moser, and Medrano—entered into separate but dependent settlement agreements with the Village. In other words, each plaintiff has a separate agreement with the Village, but

the agreements are void unless all three are approved by the Court.

As detailed in our letter to the Justice Department, this Court was deeply troubled by the evidence of racial profiling admitted in the *Martinez* case. Racial profiling of any kind is anathema to our criminal justice system because it eviscerates the core integrity that is necessary to operate that system effectively in our diverse democracy. Many respected legal scholars have closely analyzed the critical societal problems caused by racial profiling. *See, e.g.,* David Cole, No EQUAL JUS-TICE: RACE AND CLASS IN THE AMERICAN CRIMINAL JUSTICE SYSTEM (1999); Randall Kennedy, RACE, CRIME, AND THE LAW (1997); David A. Harris, *The Stories, The Statistics, and the Law: Why "Driving While Black" Matters,* 84 MINN.L.REV. 265 (1999); David Cole, *Race, Policing, and the Future of Criminal Law,* 26 HUM.RTS. 2 (Summer 1999) Dorothy E. Roberts, *Foreword: Race, Vagueness, and the Social Meaning of Order–Maintenance Policing,* 89 J.CRIM.L. & CRIMINOLOGY 775 (1999).

Professor Cole of the Georgetown Law Center, for example, points out that double standards based on race, such a profiling,

> undermine law enforcement itself, because they breed resentment and alienation among minorities. . . . People who see the criminal justice system as fundamentally unfair will be less likely to cooperate with police, to testify as witnesses, to serve on juries, and to convict guilty defendants when they do serve. In addition, people who have lost respect for the law's legitimacy are more likely to break the law themselves. . . . Finally, the perception and reality of a fundamentally unfair criminal justice system contribute to broader racial divisions in society.

Cole, *Race, Policing,* 26 HUM.RTS. at 3. If we cannot believe that our nation's law enforcement officers will enforce the law in a racially neutral manner, then we will be left with a society where members of the minority community always view the ac-

tions of any police officer with great suspicion. *See* Harris, *The Stories*, 84 MINN. L.REV. at 268 ("Pretextual traffic stops aggravate years of accumulated feelings of injustice, resulting in deepening distrust and cynicism by African–Americans about police and the entire criminal justice system.").

The reverse will also be true because racial profiling is a self-fulfilling prophecy. Officers that engage in profiling will necessarily come into contact with law-breaking members of minority communities far more frequently than with law-breaking whites and thus will view the actions of minority civilians with a presumption of guilt. *See, e.g.,* Harris, *The Stories,* 84 MINN.L.REV. at 268 ("Skin color becomes evidence, and race becomes a proxy for general criminal propensity."); *Id.* at 301 ("Put simply, there is a connection between where police look for contraband and where they find it."); Roberts, *Foreword,* 89 J.CRIM.L & CRIMINOLOGY at 818 ("[T]argeting Blacks for police surveillance results in higher rates of arrest, reinforcing the presumption of Black criminality. If police stopped and frisked whites as frequently as they do Blacks, white arrest rates would increase.").

Unfortunately, racially stereotypic "street" perceptions do not become eradicated when processed through our country's justice system; instead they are exacerbated. For example, targeting minority civilians for traffic stops distorts the sentences that they receive for other crimes because many traffic violations "count" when determining a convicted defendant's criminal history points. *See* USSG § 4A1.2(c); *see also United States v. Hernandez,* 160 F.3d 661, 669 (11th Cir.1998) ("Hernandez also should have received a criminal history point for his 1986 conviction for driving without a license."); *United States v. Burke,* 148 F.3d 832, 839 (7th Cir.1998) (affirming district court's addition of two criminal history points for the defendant's prior convictions for driving without a license and driving on a suspended license); *United States v. Boyd,* 146 F.3d 499, 502 (7th Cir.1998) (affirming district court's addition of one criminal history point based on prior conviction for operating an uninsured motor vehicle.). Likewise, courts often discount police use of race as a proxy for criminality, tacitly approving racist stereotypes underlying profiling. *See, e.g., United States v. Stone,* 73 F.Supp.2d 441, 447 (S.D.N.Y.1999) (although finding that "the officer's actions were based initially on racial stereotyping," rejecting Fourth Amendment challenge to evidence obtained as a result of the racially motivated *Terry* stop); *but see United States v. Leviner,* 31 F.Supp.2d 23, 33 (D.Mass.1998) (departing downward because seven criminal history points were attributable to motor vehicle offenses that "raise deep concerns about racial disparity.").

Racially stereotypic perceptions operate like a deadly cancer on our justice system. As Professor Kennedy accurately notes, "[t]aking race into account in a small, marginal, even infinitesimal amount still constitutes racial discrimination." Kennedy, RACE, CRIME, AND THE LAW 149. Simply put, our country can ill afford to tolerate *any* form of racial profiling by *any* law enforcement agent because it threatens the notion of equal justice upon which our legal system is based. "Legitimacy is one of the law's most powerful tools, and when the law forfeits legitimacy, its only alternative is to rely on brute force." Cole, *Race, Profiling,* 26 HUM.RTS. at 3.

For many law-abiding citizens their only contact with the criminal justice system is via interaction with the police, predominantly during traffic stops. Any hint of racism in policing erodes the public support so necessary to law enforcement efforts. The reality is that very few innocent victims of racial profiling ever come forward with complaints. Instead, these victims simply retain vivid memories of their police encounter for future reference. The ultimate result of such erosion is all too often a series of questionable jury verdicts which are difficult to explain without

resort to racial analysis or justification. Further, as Professor Cole aptly notes, "It is not surprising that virtually all the riots we have experienced in this country since World War II have been sparked by racially charged police-citizen encounters." *Id.* Thus, we must vigorously combat and abolish racial profiling wherever it may exist.

As racial profiling moves to the forefront of the national consciousness, police departments, the federal government, and courts are beginning to address the invidious effects of race profiling. Thus, for example, just last week a congressional subcommittee conducted hearings into the profiling issue. *Hearings on S.821 to Provide for the Collection of Data on Traffic Stops Before the Subcomm. on Constitution, Federalism, and Property Rights,* 146 Cong.Rec. D292 (Digest March 30, 2000). Recently, the New Jersey State Police resolved Justice Department charges of racial profiling by its officers by agreeing to extensive reform efforts and reporting requirements, *see United States v. State of New Jersey,* No. 99–5970(MLC) (D.N.J.), *available at* <http://www.usdoj.gov/crt/split/documents/jerseysa>, and the Second Circuit Court of Appeals affirmed a jury verdict of $245,000 in favor of two African American youngsters and against police in a profiling case. *Price v. Kramer,* 200 F.3d 1237 (9th Cir.2000).

Similarly, courts across the country are recognizing claims based on police use of racial profiling. *See, e.g., Rodriguez v. California Highway Patrol,* 89 F.Supp.2d 1131 (N.D.Cal.2000) (denying defendants' motions to dismiss Fourth Amendment and equal protections claims for targeting African American and Latino drivers); *National Congress of Puerto Rican Rights v. City of New York,* 191 F.R.D. 52 (S.D.N.Y.1999) (concluding that Black and Latino plaintiffs stated an equal protection claim by alleging police targeted them for *Terry* stops because of their race and na-

tional origin); *Wilson v. Tinicum Township,* No. 92–6617, 1993 WL 280205 (E.D.Pa. July 20, 1993) (certifying class in action against officers for violating Fourth and Fourteenth Amendments by profiling). We believe this trend is a positive step toward eradicating the ills of racial profiling and encouraging minority civilian support for necessary law enforcement efforts.

Against this background, the Court was initially concerned that the settlement agreements at issue did not contain any measures addressing the racial profiling evidence revealed during the *Martinez* trial. Nevertheless, the Court is satisfied that the Village of Mount Prospect is moving in a positive direction to alleviate even the appearance of racial profiling by its police force. On March 1, 2000, the Village announced measures to increase public trust in its Police Department similar to those contained in the New Jersey consent decree. For example, the Village has promised to enact a formal policy banning racial profiling, has eliminated ticket quotas for its officers, and will require officers to note the race of all drivers they stop. Additionally, the Village will create a computer database to track the racial and ethnic information collected by officers making traffic stops and aggressively recruit minorities for its police force. Finally, the Village will create a human rights review board, made up of a village manager, a resident, and a clergy member, to monitor racial profiling complaints as well as the information generated by the other reform efforts. These reform efforts should place Mount Prospect at the forefront of the local communities that are seeking to address both the perception and reality of racial profiling. The Court hopes that other communities will follow Mount Prospect's courageous lead without the need for protracted and expensive litigation.[3]

---

**3.** Of course, this Court is also aware in approving the individual settlements that the Department of Justice will remain free to pursue whatever action it deems appropriate.

Likewise, this opinion is not meant to prejudge any of the issues pending in *Romero v. Village of Mount Prospect,* No. 00 C 861 (pending class action racial profiling lawsuit).

At the same time, Mount Prospect and other suburban communities should realize that the effort to eliminate both the perception and reality of racial profiling is a major undertaking. All aspects of Mount Prospect's announced measures are critical. Recent national and local police incidents show that merely hiring minority police officers is not a sufficient stand-alone remedy to address this difficult problem. Indeed, as the *Martinez* lawsuit shows, making sure that hired minority officers succeed and are given opportunities in their respective departments is an important second step. Diversity training classes, for both minority and non-minority officers, is a critical third step. Only through constant efforts to comprehend and appreciate our racial and ethnic differences can we effectively serve our diverse citizenry. Proactive monitoring of all these efforts, as well as collecting and analyzing all police stop data on the basis of race and ethnicity, is another key component of a true effort to combat racial profiling.

### CONCLUSION

Professor Cole believes a three-fold response is necessary to eradicate the inequalities in today's criminal justice system, only two are relevant here. First, we must acknowledge the problem; and second, we must restore legitimacy to the system by adopting measures to eliminate the double standards applied by the system.[4] Cole, No EQUAL JUSTICE 186–87. As to the second step, he advocates, among other things, "public reporting of the racial character of police practices." *Id.* at 188. The Village, by acknowledging at least the appearance of a problem and adopting the measures outlined above, is making strides to improve the relationship between its citizens and police and, in this manner, is increasing the efficacy of its police force.

Mount Prospect is not the first suburban community that has struggled with racial diversity. *See, e.g., Hispanics United v.*

*Village of Addison, Ill.,* 988 F.Supp. 1130 (N.D.Ill.1997) (this Court approved a consent decree in a hotly contested housing discrimination case). Nor will Mount Prospect be the last community to confront the specific issues raised in these lawsuits. The Court easily concludes that this litigation must end and can only hope that a new era will emerge in the Village of Mount Prospect. Three years ago this Court remarked that "[t]he hallmark of a great society—a true racially and ethnically integrated community—is an elusive goal that unfortunately still has not been achieved in most urban and suburban communities." *Id.* at 1135. Perhaps aggressive implementation of Mount Prospect's new measures may help it achieve this elusive goal.

For these reasons, we have no reservation about approving the settlement agreements in *Martinez* and *Moser.* Accordingly, case number 96 C 6027 and case number 98 C 7580 are dismissed with prejudice.

Appendix "A"

January 18, 2000

Scott R. Lassar, Esq.

United States Attorney

Northern District of Illinois

219 S. Dearborn Street

Chicago, Illinois 60604

William Lann Lee, Esq.

Assistant Attorney General

Civil Rights Division

U.S. Department of Justice

Washington, D.C. 20530

Dear Sirs:

In December of 1999, I was assigned to preside over the case of *Javier Martinez v. Village of Mt. Prospect,* No. 96 C 6027. Mr. Martinez is a former police officer who was terminated by the Village of Mt. Pros-

---

4. Professor Cole's recommended third step is developing "community-based responses to crime, both at the preventative and punitive stages." No EQUAL JUSTICE 187, 189–208.

pect in the fall of 1995. Mr. Martinez alleged at trial that he was discriminated against because of his Hispanic heritage. More importantly, he alleged and offered evidence that the Village of Mt. Prospect's Police Department has a policy of racial profiling against Hispanics. The trial of this case was conducted between January 10 and 18, 2000. On January 18, 2000 an eight person jury ruled in plaintiff Javier Martinez's favor on both his discrimination and official custom claims and awarded compensatory and punitive damages totaling almost $1.2 million.

During the trial, Mr. Martinez's attorney offered strong evidence that Hispanics are targeted by the Mt. Prospect Police Department. The record contains testimony by current and former police officers of both Hispanic and non-Hispanic background, as well as statistical evidence. The testimony at trial established that the Village has arrest performance standards or arrest quotas and that officers were directed to reach these standards in Hispanic areas. The evidence at trial showed that 38 to 50% of Mt. Prospect's arrestees for the years 1994 to 1999 were of Hispanic descent even though Hispanics account for only 6% of its population and less than 10% of the entire state's population.

I have been involved in the criminal justice system for over twenty years. During my service as a prosecutor, I received numerous awards for successfully prosecuting numerous defendants of all backgrounds, including Hispanics and other minorities. In fact, during the course of one successful prosecution, my own life was put in jeopardy by a Hispanic defendant. In short, my record on the need to support law enforcement efforts is well established. Yet at the same time, no one feels stronger that we must eliminate all racial disparity in law enforcement than do I.

Based on my experience as a trial judge, former federal prosecutor and former civil rights attorney, I believe the trial evidence in the case of *Martinez v. Mt. Prospect* establishes a justifiable reason to conduct an investigation into alleged racial targeting of Hispanics by the Village of Mt. Prospect Police Department. Only an objective investigation will determine if the civil rights of Hispanics are being violated by the Village. The logical starting point for this investigation should be the trial transcript and evidence in this case. I also recommend that your attorneys consult with Mr. Martinez's attorneys.

I understand that it is somewhat unusual for a judge to request an investigation, yet my oath as a judge requires me to bring this potential civil rights violation to your attention. Only your investigation can bring this matter to an appropriate resolution.

Respectfully,

Judge Ruben Castillo

United States District Court